## Walker *versus* Reamy.

The Act 11th April 1848 does not make the separate estate of a married woman so exclusively her own as to exclude her husband's use of it, as the head of the family; or enable her to invest it in any way she please, without his consent.

The estate thus secured to a married woman is only analogous to the equitable separate estate, and is modified by the fact that she has no trustee distinct from her husband; and that he, therefore, as the legal guardian of her rights, necessarily becomes in a large sense her trustee.

If treated as separate estates are ordinarily treated, she can have no separate power over it, that is not expressly and specifically given.

It is impossible that a woman can use and enjoy her property as fully and separately after marriage, as before; the nature of the relation does not allow it; she must enjoy it in a different way, in union with her husband. The Act of 1848 was not intended to interfere with the community of the marriage relation.

So far as regards creditors, all the money and personal property of the family are presumed to belong to the husband, until the contrary be shown; and all the earnings of the family, with some exceptions, are conclusively presumed to be his.

Where a married woman claims property in opposition to her husband's creditors, which has been purchased since the marriage, she must show affirmatively that she has received money or other property " by will, descent, conveyance or otherwise," and invested it in the property claimed.

It is not enough to show that she received money from her father, before the passage of the Act of 1848; for that became the husband's property by virtue of the marriage relation.

Nor that she was seen in the frequent possession of money after the passage of the act; for in such case, the presumption is, that it was the husband's money.

ERROR to the Common Pleas of *Blair county*.

This was an ejectment by Daniel K. Reamy against Nicholas Walker, for a dwelling-house and lot of ground on the south side of the canal basin, in Hollidaysburg. The facts of the case are fully stated in the following charge delivered to the jury, on the trial in the court below, by TAYLOR, P. J.:—

"The plaintiff, on the 21st of April 1854, obtained a judgment against the defendant, in this court, for $518.44, being, as it appears, a balance due upon a contract made between the parties the 6th of March 1852, for the erection of a house upon the property in controversy, and which was finished about the 1st of August following; and in execution of this judgment the property was duly sold to the plaintiff the 25th of July 1855, and a deed dated the 28th of July, and acknowledged the 6th of August 1855, was delivered to the plaintiff by the sheriff. And the sheriff certifies that ' at the time of the levy and sale, Nicholas Walker (the defendant) was in possession of the property.' This makes out, *primâ facie*, the plaintiff's case, and his right to a verdict.

[Walker v. Reamy.]

"It is alleged in defence, that the property belonged to Anna Maria Walker, the wife of Nicholas Walker, the defendant, and in proof of this, it is shown, that she entered into an article of agreement with Henry Lloyd, on the 5th of February 1852, for the purchase of the lot; and it appears further in the defendant's evidence, that the money paid upon the contract, so far as the payments are shown, was paid by her. It is contended, therefore, that the property belonged to her, and not to her husband, and consequently that the plaintiff cannot recover.

"It is true, and conceded, that if the property belonged to the defendant's wife, that would amount to a successful defence, although she is not a party to the record, or a defendant in this action, and although Walker was in possession of the property at the time of the levy and sale by the sheriff. But it is denied, on the other hand, that it is, or was at the date of the plaintiff's judgment, or at the time of the levy and sale by the sheriff, her property. Whether it was, and is her property, or was the property of her husband, the defendant, is, therefore, the turning question in the case.

"That the consideration of the judgment of the plaintiff upon which it was sold by the sheriff, was the erection of a house upon it, after the contract of Mrs. Walker with Mr. Lloyd for the purchase of the lot, as the evidence shows, or that she was present while the building was being put up, and gave directions in relation to the work, as is also in evidence, we treat as of no importance in the case. The hinging question is, was the lot in controversy the property of Nicholas Walker, the defendant, or the property of his wife?

"In view of all the facts thus far considered, the presumption of law is, that it belonged to him. She being a married woman, notwithstanding the contract for the lot was in her name, and the money was paid by her, the law presumes it to have been the money of her husband, or money furnished by her husband; and to make out the defence, it is incumbent on the defendant, to show by *clear proof* that the money paid was *her* money. This, it cannot be questioned, is the well established rule of law, applicable to the case.

"'When property is claimed by a married woman,' says BLACK, C. J., in Gamber v. Gamber, 6 *Harris* 366, 'she must show by evidence which does not admit of a reasonable doubt, either that she owned it at the time of her marriage, or else acquired it afterwards by gift, bequest, or purchase. In case of a purchase after marriage, the burden is upon her to prove distinctly that she paid for it with funds which were not furnished by the husband.' And in Keeney v. Good, 9 *Harris* 349, he says, 'to bring the property of a married woman under the protection of the Act of 1848, it is made necessary by the letter as well as the spirit of the statute,

[Walker *v*. Reamy.]

to prove that she *owns* it.   She must identify it as property that was hers before marriage, or show how she came by it afterwards. Evidence that she purchased it amounts to nothing, unless accompanied by *clear and full proof that she paid for it with her own separate funds*.   In the absence of such proof, the presumption is a violent one, that her husband furnished the means of payment. This was the rule laid down in Gamber *v*. Gamber, 6 *Harris* 363, and must.be rigidly adhered to.   It applies to the purchasers of real estate, as well as personal.'

"Now, what evidence is adduced by the defendant upon this question?   That the contract for the lot was in the name of the defendant's wife, and that she paid the money, would 'amount to nothing,' without more, in favour of the defence; on the contrary, it supports, as we have seen, a violent presumption against her right; or in other words, that the money was furnished by her husband, and that the property under that purchase belonged to her husband.   It is necessary to go further and show, by clear and full proof, that the money paid by her was actually her money.   And what evidence have we that it was?   It is shown by several witnesses, that in 1844, more than seven years before these contracts, her father gave her a considerable sum of money. The amount, however, is very indefinitely stated.   One witness testifies, that the night before she started to come to this country, 'her father came in with a little poke of money, about a gallon and a half, and poured it in her lap; he supposes there might have been five or six hundred dollars.'   It is testified also, that she had money after they arrived in New York; and also in Bedford county, in the winter of 1844 or 1845.   Another witness states, that she showed him a 'good bundle of money' in 1848, which was only a few years before this contract; and Judge Gardner testifies, that he collected a foreign draft for $150, the name to which he could not read, and paid her the money, the 3d April 1856, four years after the contract.   It is also testified, that her husband, the defendant, had but little property in Germany, though it is shown, on the other hand, that he had been keeping a boarding-house for emigrants, on the basin at Hollidaysburg, had a good custom, and appeared to be doing a good business.   But does all this, giving it the utmost weight that could be claimed for it, amount to clear and full proof that the money paid Mr. Lloyd was her money?   She might have had money in 1844, or in 1848, and not had it in 1852; or she may have it yet.   The utmost that the evidence shows, is that the money *may have been* hers.   In treating of the application of similar evidence, in Keeney *v*. Good, C. J. BLACK says: 'There was no spark of evidence that the money paid was her own; her counsel have not asked us to believe that these were the same fifty dollars which she had received four years before from her father's administrators.'   If the evidence

[Walker v. Reamy.]

rendered it *probable* that the money paid was her own, that would not be sufficient. Evidence which affords a probability only, falls far short of the clear and full proof which the law in this case requires. In any view which can be taken, offered for that purpose, and giving it the utmost force that could be claimed for it, it fails to make out the defence,

"The defendant's counsel request the court to charge the jury, that if they are satisfied beyond a reasonable suspicion, that the money paid at the making of the agreement, was the money of Mrs. Walker, they should find for the defendant.

"This point correctly assumes the rule of law as it has been stated. The jury, however, must be so satisfied by *evidence*, and there is manifestly no evidence which proves the fact in controversy (not to say which amounts *to clear and full proof*) no evidence upon which we think the court should submit the question to the jury. Upon the whole case, therefore, we direct a verdict for the plaintiff."

To this charge the defendant excepted; and a verdict and judgment having been rendered for the plaintiff, the defendant sued out this writ, and here assigned the same for error.

*Banks, McDowell,* and *Murray,* for the plaintiff in error.—The question to be determined in this case was one of fact, and the court below erred in withdrawing it from the jury, and directing them to find for the plaintiff: Delany *v.* Robinson, 2 *Wh.* 503; Logan *v.* Matthews, 6 *Barr* 421; Adams *v.* Columbian Steamboat Company, 3 *Wh.* 75; Baker *v.* Lewis, 4 *Rawle* 356; Newbold *v.* Wright, *Id.* 195; Sampson *v.* Sampson, 4 *S. & R.* 329; Fisher *v.* Kean, 1 *Watts* 278; Dean *v.* Connelly, 6 *Barr* 239; King *v.* Kline, *Id.* 318.

The court below not only charged that all the presumptions were violently against the wife, but that the purchase of the lot by her, in her own name, and the payment of the money by her, increased the violence of the presumption against her. This is carrying a harsh rule a little further than it has ever before been attempted to be carried. The facts of this case support no such presumption. Since the Act of 1848, a *feme covert* is allowed to buy and have conveyed to her real estate in her own name. If she is, therefore, authorized by law to do so, and she can pay her own money more directly than any one else, how could Mrs. Walker have availed herself of the provisions of the Act of Assembly, if she had acted differently from what she has done? Instead of these facts supporting a violent presumption against her, they are in her favour; at any rate, they ought not to prejudice her cause with the jury. We do not say that these facts, of themselves, were enough to have entitled her to a verdict, but taken in connexion with the other

evidence in the cause, they amounted to clear, full, and satisfactory proof, that the lot was purchased with Mrs. Walker's money.

*Calvin,* for the defendant in error.

The opinion of the court was delivered by

LOWRIE, C. J.—Let us endeavour to get a proper mental position for studying this case, by considering how far the Act of 11th April 1848 changes the relation of husband and wife with regard to her property. It declares that a single woman's property shall continue hers "as fully after marriage as before," and that property acquired by a married woman "shall be owned, used, and enjoyed by her as her own separate property;" and in neither case shall it be subject to levy and execution for the debts of her husband, or to be transferred or encumbered by him without her consent.

A little reflection will make it quite obvious that the terms here used will not bear to be taken in their largest signification. They are, in fact, limited in the law itself in several important particulars, one of which is, that her husband, on her death, shall have his curtesy, whether she will or not. And as the only object of the act was to afford a protection to the estates of married women, we may assume that it was not intended that she should so "fully" own her "separate property" as to impair the intimacy and unity of the marriage relation. It was not intended to declare that her property should be so separate that her husband could be guilty of larceny of it, or liable in trespass or trover for breaking a dish or a chair, or using it without her consent. It was not intended, by allowing her to own her property "as fully after marriage as before," that he should not sit at her table, or use her furniture or house, without her consent specially given, or that she might have an action of *assumpsit* against him for use and occupation of her house, or for the use of her carriage, or for boarding at her expense, or that she may obtain a divorce, *a mensa et thoro*, by an action of ejectment. It was not intended that her property should be so separately hers that she might invest her funds in cattle, or ships, or notions, or menageries, or wagons, without his consent, and turn drover, or shipmaster, or common carrier, or travelling showman, or pedlar. The unity of the marriage relation forbids this, and our common sense saves us from such an interpretation of the law.

The terms of ownership in the law are different for women having property when married and those who acquire it afterwards; but their sense is the same in both cases. They are evidently borrowed from the usual phraseology of the law relative to equitable separate estates. Yet the estate thus assured to the wife is only analogous to the equitable separate estate, and is

[Walker *v.* Reamy.]

seriously modified by the fact that she has no trustee separate from her husband, and that he, therefore, as the legal guardian of her rights, necessarily becomes, in a large sense, her trustee; but without all of the law's suspicion of his dealing with the trust-property, for the community of interests and sympathies of husband and wife forbid this. If we treat it as separate estates have been ordinarily treated, she can have no separate power over it except that which is expressly and specifically given: 1 *Rawle* 231.

The law gives the wife a separate estate in her own property, and to the clauses declaring this it adds: " *And* the said property shall not be subject to levy and execution for the debts of her husband, or transferred or encumbered by him without her consent, &c." Now, if instead of *and,* we read *and therefore,* or *so that,* we cover all the ground that the law is usually needed for, and perhaps all that it was intended to cover. The terms which precede the word *and,* include, in their largest sense, those which follow it, and therefore these can add nothing to that sense. But if by *and,* is meant *and therefore,* or *so that,* then the following words become explanatory and restrictive, and alone express the special meaning of this part of the law.

This interpretation is favoured by the evident fact that the special instances, following the word *and,* were the only instances then entering into the thought of the legislature as needing its interposition. The provisions relative to devises and descents are evidently mere after-thought; and they display a sort of chivalrous generosity that is hardly consistent with the plain common sense of the law; for they allow a wife to give away all her personal property from her surviving husband, and do not allow him to treat her in the same manner; and if she be a second wife, surviving her husband, she may so arrange matters that the fatherless and motherless children of her husband shall not get half as much of their father's estate as her own children. This generosity must often have a strong smack of injustice in its application.

We must presume that there was some evil in the old law which this legislation was intended to remedy, and we know there was; but we must also presume that no innovation on the old law was intended further than was absolutely required: 1 *Kent* 464. We are sure that there was no intention to alter the nature of the family relation, and we are not so to administer the law as to change, by inference and deduction, that which is not expressly changed: *quod contra rationem juris introductum est, non est producendum ad consequentia.* It is impossible that a woman can use and enjoy her property as fully and separately after marriage as before; the nature of the relation does not allow it; she must enjoy it in a different way, in union with her husband.

[Walker *v.* Reamy.]

The necessity of restricting the absoluteness of the terms is therefore obvious. Even the husband must submit to this law; for he also must enjoy his property in a very different way. It is in fact no longer his alone, for it is subject to all the legal duties of the family relation. There can be no absolutely separate property in any one, for it must be subject to all the duties of the general, social, or civil state, and is worthless without it. Even the separate estate of a partner is subject to answer for all the liabilities of the partnership, though, as to him, they be only imputed ones.

The social relation of husband and wife is much more intimate than any other, and necessarily involves a much closer community of material interests. Persons cannot be so strictly united, without involving a community of property, to a degree that belongs to no other social relation, and a still greater community in the enjoyment of it; and it is impossible for us to disturb this community, by deducing consequences from the general terms of the law, that are incompatible with the general character of the relation. We cannot reasonably be expected to do more than administer the changes which are expressly defined.

The community of the marriage relation still exists, therefore, in law, as it certainly does in the general facts of social life. The husband is still the head of the family. He is the legal representative of all its civil interests, that are not set apart from the general relation, by means of trustees or guardians, or, in some other way, specially provided for. So far as regards creditors, at least, all the money and other personal property of the family are presumed to be his; and all the earnings of the family are conclusively so presumed, with some exceptions that are not relevant here.

In the present case, therefore, we start with the presumption that the money, which this wife laid out in the lot in controversy, was the money of her husband, and she must rebut this presumption. How does she propose to do it? By showing that she had received money from her father several years before the Act of 1848. That goes for nothing, for, as the law then was, it became her husband's as soon as it was given to her, or as soon as she came with her husband to reside in this state; without considering that there is no evidence that she kept it for eight years. Will she show that she was often seen with money in her possession after the law of 1848? That is no evidence that it was not her husband's; for most husbands allow their wives to have possession of much of their money; especially men of small means, who keep no bank accounts; their wives are usually their bankers, their money being left in the house in their care. This is a part of that trustfulness, intimacy, and community that belong to the marriage relation. For the purposes of the family, such money

[Walker v. Reamy.]

is common property between husband and wife; but in respect to creditors, it is his.

It is quite apparent in this case, that the wife was the keeper of her husband's money, for there are instances in the evidence when he, wanting money, sent her to bring it out. But the legal presumption is strong enough without this. Her case required her to show that, after her marriage, she had received money or other property of her own, "by will, descent, conveyance, or otherwise," and that she invested that in this lot. She offers no evidence of the kind, that can apply to this purchase; and that is a sufficient answer to her claim. Even her payments, made at many different times, show not that she had money of her own, but that she was investing her husband's savings. There is evidence that she got $150 from Germany; but this was four years after the purchase, and even after the plaintiff had got the title he is suing on, and of course, it had not been invested in the lot. All this shows that there was no competent evidence to leave to the jury to show that she had received money of her own after her marriage, and after the Act of 1848, or to rebut the presumption that the lot was purchased with her husband's money.

Other evidence shows how very just is the legal result here; for shortly after the purchase, the husband contracted, with the manifest concurrence of his wife, for the erection of a house upon the lot, and it was erected, but not paid for, and the builder had to enforce payment by suit, judgment, execution, sale of the house and lot, and buying it in himself. If he bought it low, it was no doubt because the husband and wife made the title suspicious and doubtful.

Judgment affirmed.